```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


Patty Martin,                    :

        Plaintiff,               :

    v.                           :     Case No. 2:09-cv-0363

Mars Petcare,                    :     Magistrate Judge Kemp

        Defendant.               :
```

OPINION AND ORDER

Plaintiff Patty Martin filed this civil rights action in the Court of Common Pleas of Franklin County, Ohio. In her complaint, she asserting claims of employment discrimination against defendant Mars Petcare under Ohio Revised Code §4112.99 and 42 U.S.C. §1981. The gist of Ms. Martin's complaint is that her race was a determining factor in Mars Petcare's decision to terminate her employment. Mars Petcare removed the state-court action to this Court pursuant to 28 U.S.C. §1441 based on federal question jurisdiction. After discovery, Mars moved for summary judgment on both of plaintiff's claims. For the following reasons, the Court will grant the motion.

I. Factual Background

The facts of this case are largely undisputed. For the most part, this statement of facts is taken from Ms. Martin's affidavit and her deposition. Other facts are taken from the exhibits filed by Mars Petcare in support of its summary judgment motion or from the deposition of Michael Weber, which Ms. Martin filed as part of her response to the motion.

Ms. Martin became an entry-level employee of Mars Petcare in August 2004 at its facility in Columbus, Ohio. Prior to this employment, she had worked at the same plant as a temporary employee for eight years. In 2006, she bid on and received a

promotion to an Operator position.  She continued to hold that position until she was fired on May 6, 2008.

The events which led to the firing took place on May 4, 2008.  Ms. Martin was approved to work overtime on that date.  When she arrived prior to the start of her shift, she asked Gordon Maccabee, a regular on that shift, which area she would be working in.  Mr. Maccabee told her that she and Robert Owens, another employee working overtime, should report to the Blend Cell area.  Rudy Reed, the supervisor on duty for that shift, appeared a few minutes later, and Mr. Owens informed him that he and Ms. Martin were planning to work in the Blend Cell area and asked him if that was all right.  Mr. Reed indicated that would be fine.

When Ms. Martin showed up to work in the Blend Cell area, Norma Cassill, a regular employee on that shift, told her that she (Cassill) was going to work in the Blend Cell area and that Ms. Martin needed to work in the Thiele area which was located upstairs.  Ms. Martin responded that she had already been assigned to the Blend Cell area and that she did not intend to report to the Thiele area.  Ms. Cassill immediately telephoned Mr. Reed and informed him that Ms. Martin was refusing to work in the Thiele area.  Mr. Reed had Ms. Cassill put Ms. Martin on the line.  He inquired whether she knew how to operate the machine in the Thiele area.  When she answered affirmatively, he asked her to work in that area instead of the Blend Cell area.

An argument ensued as soon as Ms. Martin got off the phone.  Ms. Martin strenuously let Ms. Cassill know that she did not appreciate the fact that a co-worker (Cassill) was bossing her around in order to avoid less desirable work assignments.  The extent of their confrontation is the most significant disputed fact in this case.  Ms. Martin admitted at the time (and still admits) to being upset and raising her voice, but she has

steadfastly denied that any physical contact occurred.  Ms. Cassill, on the other hand, contends that, as the yelling continued, Ms. Martin kept getting closer and closer until she was in her face, and that she eventually "chest bumped" her.  After the argument, Ms. Martin went to the Thiele area to work while Ms. Cassill remained in the Blend Cell area.

  Ms. Cassill did not report the alleged chest-bump incident until some three hours later when she informed Mr. Reed.  Shortly thereafter, both Ms. Cassill and Ms. Martin were taken off the floor.  Mr. Reed and Bethany Ebert, a Senior Operator, first interviewed both women together.  After speaking to them, Mr. Reed and Ms. Ebert contacted Brett Spangler, the Operations Manager.  Mr. Spangler, in turn, contacted Clarice Clement, the Regional Personnel & Organization Manager.  Mr. Spangler then called back to advise that, after obtaining written statements from Ms. Cassill and Ms. Martin, the two women should be sent home pending an investigation.  Ms. Ebert obtained Ms. Cassill's statement, while Mr. Reed took Ms. Martin's.  Mr. Reed and Ms. Ebert also spoke with Terry Chambers, an Operator who was present at the time of the incident, and obtained his written statement.

  The next day, Ms. Clement directed Mike Weber from the Personnel and Organization Department at Mars Petcare to conduct the investigation.  In conducting his investigation (which was the first one he ever performed at Mars Petcare), Mr. Weber spoke with Mr. Reed, Ms. Ebert, Mr. Chambers, and Teresa Harmon, a temporary employee who was present at the time of the incident.  He wanted to speak to two other temporary employees who were also present when the argument took place, but could never determine their identities.  Mr. Weber did not speak with Ms. Martin, Mr. Maccabee, or Mr. Owens because he was not directed by Ms. Clement to do so.  However, Ms. Clement spoke with Ms. Martin several times during the investigation process.  In addition to the

interviews, Mr. Weber reviewed the written statements obtained from Ms. Cassill, Ms. Martin, and Mr. Chambers.

Mr. Weber concluded his investigation the same day and reported his findings and recommendations to Ms. Clement.  Based on his interviews and the written statements, Mr. Weber believed that Ms. Martin made physical contact with Ms. Cassill in the form of a chest bump.  In light of the physical contact, and because he believed it was Mars Petcare's policy to fire any employee who made physical contact with a co-worker, he recommended that Ms. Martin's employment be terminated.  He further recommended that Ms. Cassill receive coaching on how to talk to other associates and to learn to be a leader without coming across as bossy.

Ms. Clement accepted the findings and recommendations made by Mr. Weber.  In conjunction with the plant manager, Robert Arnold, she made the decision to terminate Ms. Martin's employment and to issue a written warning to Ms. Cassill.  On May 6, 2008, Ms. Clement contacted Ms. Martin and informed her that she was fired.

## II. Summary Judgment Standard

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute.  It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464 (1962).  The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).  Additionally, the Court must draw all reasonable

4

inferences from that evidence in favor of the nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion.  It is with these standards in mind that the instant motion must be decided.

### III. Legal Analysis

Ohio Rev. Code §4112.99 provides that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief."  Ms. Martin's state-law claim apparently derives from Ohio Rev. Code §4112.02 which, in relevant part, prohibits an employer from discharging an employee without good cause because of the employee's race, or otherwise from discriminating against that employee on the basis of race with respect to the conditions or privileges of employment.  42 U.S.C. §1981, under which Ms. Martin's federal claim arises, similarly prohibits racial discrimination in the "making, performance, modification, and termination of contracts."  Both claims are properly analyzed under the same standards applicable to Title VII cases.  See Thompson v. UHHS Richmond Heights Hosp.,

5

Inc., 372 Fed.Appx. 620, 623 (6th Cir. 2010).  Where a plaintiff does not come forward with direct evidence of discrimination, as here, courts must operate under "the well-established *McDonnell Douglas/Burdine* burden-shifting framework."  McClain v. Northwest Community Corrections Ctr. Judicial Corrections Bd., 440 F.3d 320, 332 (6th Cir. 2006).

### A.   The Prima Facie Case

To establish a prima facie of racial discrimination, Ms. Martin must establish (or at least present facts from which a trier of fact could reasonably infer) that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated white employees who engaged in the same or similar conduct.  Id.  If Ms. Martin succeeds in establishing a prima facie case of racial discrimination, the burden shifts to Mars Petcare to articulate a legitimate, nondiscriminatory reason for her discharge.  Should Mars Petcare meet its burden of production,  Ms. Martin must then produce evidence that the defendant's proffered reason was not the true reason, but was merely a pretext for its unlawful racial discrimination.  Id. (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

Mars Petcare concedes that Ms. Martin can meet the first three elements of a prima facie case.  It maintains, however, that Ms. Mars cannot satisfy the fourth element because she is unable to show that a person outside of her protected class, who engaged in conduct similar to hers, was treated more favorably than she was.  Ms. Martin argues, contrary to the defendant's contention, that Ms. Cassill, the other participant in the confrontation, was a similarly situated white employee who was treated in a strikingly different manner than she was.

6

To be "similarly situated" in the context of employee discipline, the individual or individuals with whom the plaintiff seeks to compare her treatment must be nearly identical in all *relevant* aspects. Noble v. Brinker Int'l, Inc., 391 F.3d 715, 728-29 (6th Cir. 2004)(internal citations and quotation marks omitted).  This means that the plaintiff and any other non-protected employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

It is unclear whether Ms. Martin and Ms. Cassill shared the same supervisor at the time of the incident.  Regardless of that point of comparison, the same manager (Clarice Clement) decided their level of discipline.  In addition, both women were subject to the same policies, practices, and guidelines for employment established by Mars Petcare.  It is also undisputed that Mars Petcare treated Ms. Martin and Ms. Cassill differently.  As a result of the May 4, 2008 incident, Ms. Martin was fired, but Ms. Cassill received only a written warning and verbal coaching on how to interact better with her co-workers.  The question thus becomes whether a jury could reasonably find that the two employees engaged in the same or essentially the same conduct and, if so, that there are no differentiating or mitigating circumstances which would distinguish their conduct or Mars Petcare's treatment of them.

The record amply demonstrates that Ms. Martin and Ms. Cassill had a verbal argument about whether Ms. Martin had to work in the Thiele area and whether Ms. Cassill had the authority to tell her to do so.  The real question is whether Ms. Martin did something during the course of that argument - namely,

initiate physical conduct with Ms. Cassill - which Ms. Cassill did not do, and which makes their conduct sufficiently different to justify Mars Petcare's different treatment of the two of them. As illustrated by the factual statement set forth in the first section of this Opinion and Order, that fact is very much in dispute.

Two people said that the physical contact - which Mr. Weber acknowledged as the primary basis of his recommendation that ms. Martin be fired - occurred.  One was Ms. Cassill, and the other was a witness to the confrontation, Terry Chambers.  On the other hand, Ms. Martin has consistently denied "chest bumping" Ms. Cassill or making any kind of physical contact with her.  The only other eye-witness to the dispute, Teresa Harmon, said she was closer to the two people arguing than was Terry Chambers, and although she said Ms. Martin was "in Ms. Cassill's face" and waving a finger at her, she did not report seeing any physical contact between them.  It is fairly clear from Mr. Weber's deposition that if he had not believed Ms. Cassill and Mr. Chambers about the physical contact, he would not have recommended that Ms. Martin be fired.  Thus, on the somewhat narrow issue of whether the conduct of Ms. Martin is essentially indistinguishable from the conduct of Ms. Cassill, there are material facts in dispute.

Ms. Martin also maintains that she was similarly situated to other employees who committed workplace violations at Mars Petcare's facility, but were not fired.  In one example, Ms. Martin describes a scenario in which Belinda Morrison, who is African-American, had complained that Mike Flesch, a white employee had pushed her, called her a derogatory name, and said that she was pathetic.  Mr. Flesch admitted to arguing with Ms. Morrison, telling her to stop "bitching" and calling her pathetic, but denied he had shoved her.  There were no other

8

witnesses to the argument.  Mars Petcare determined that it was unclear what had occurred and issued verbal reprimands to both Mr. Flesch and Ms. Morrison.

The Court need not decide if this second example also satisfies Ms. Martin's burden of production with respect to the fourth element of her prima facie case.  It is enough that she has presented some evidence from which the trier of fact could infer that Mars Petcare treated similarly-situated employees of different races differently.  Consequently, the Court must now explore whether summary judgment is appropriate because Mars Petcare had (or believed it had) a legitimate, nondiscriminatory reason for firing Ms. Martin.

### B.  The Nondiscriminatory Reason

The nondiscriminatory reason which Mars Petcare relies on in this case is, of course, the fact that Ms. Martin made physical contact with Ms. Cassill during the course of their argument.  Although there is a factual dispute over whether this actually happened, that dispute does not prevent Mars Petcare from relying on this reason as a legitimate basis for firing Ms. Martin.  Rather, if the record shows that the people who made the firing decision - primarily Mr. Weber and Ms. Clement, believed it happened and acted on that belief - the physical altercation could serve as the basis for firing Ms. Martin for nondiscriminatory reasons even if that belief was mistaken.

Although this may seem odd (that is, the fact that an employer can rely on something which did not happen as a defense to an employment discrimination suit), it reflects the fact that this case is not ultimately about whether Mars Petcare made the right decision when it fired Ms. Martin.  She had no legal entitlement not to be fired for any reason, even a foolish or incorrect one; she simply had a legal entitlement not to have her race (or any other protected characteristic, such as gender,

9

national origin, and so on) be a factor in the decision to fire her.

The Court of Appeals explained this concept well in Niswander v. Cincinnati Ins. Co., 529 F.3d 714 (6th Cir. 2008). There, an employee was fired for allegedly improperly disclosing confidential documents to her attorneys. She claimed that the disclosure was not only permitted but actually required by her employer's written policies. The court held that whether she was correct or not was ultimately irrelevant to the question of whether she had been fired for a legitimate, nondiscriminatory reason because she "failed to show the presence of a genuine issue of material fact regarding [her employer's] honest belief that she had violated the company's privacy policy." Quoting from a prior decision, Majewski v. Auto. Data Processing, Inc., 274 F.3d 1006, 1117 (6th Cir. 2001), the court noted that "'[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.'" Consequently, where the decision-maker testifies that he or she honestly believed that the fired employee did something which justified that firing, and the employee does not come forward with any evidence to rebut that testimony, summary judgment in the employer's favor must be granted even if the event that led to the firing did not actually occur. The Court of Appeals has cautioned, however, that not just any type of "honest belief" in a nondiscriminatory reason is enough. Rather, the employer must show that it reasonably relied on "'the particularized facts that were before it at the time the decision was made,'" see Wright v. Murray Guard, Inc., 455 F.3d 702, 708 (6th Cir. 2006), quoting Smith v. Chrysler Corp., 155 F.3d 799, 806-07 (6th Cir. 1998).

Here, both Mr. Weber and his supervisor, Ms. Clement, who

10

made the final decision to fire Ms. Martin, were aware that there was some dispute about whether Ms. Martin bumped Ms. Cassill during the course of their argument.  According to Ms. Martin's deposition, after she challenged Ms. Clement's decision to fire her, Ms. Clement told her that "this is what we found" (Martin deposition, #36, at 182 - apparently a reference to the fact that Mr. Weber and Ms. Clement ultimately found Ms. Cassill's and Mr. Chambers' version of the incident more believable than Ms. Martin's.  Mr. Weber expressly testified that he thought, based on the statements from Ms. Cassill and Mr. Chambers, that it was "likely" that their version of the events was correct (Weber deposition, #35, at 102), and that he considered physical contact between employees, regardless of the reasons for it, to be an offense that justified the termination of employment.  Thus, Mars Petcare has put forth evidence which both articulates a nondiscriminatory reason for the firing - its supervisors' honest belief that Ms. Martin bumped Ms. Cassill - and which is reasonably based on the particular facts which were before it at the time.  Because there is no direct evidence in the record that either Mr. Weber or Ms. Clement took Ms. Martin's race into account when deciding to terminate her employment, the only way that Ms. Martin can avoid summary judgment is to show that there is a genuine issue about whether these supervisors actually and reasonably believed that she committed this workplace offense.

    There is no direct evidence (such as an admission by either Mr. Weber or Ms. Clement) that they did not honestly think that Ms. Martin made physical contact with Ms. Cassill.  Ms. Martin argues, however, that it can be inferred that the reason given for her termination was merely a pretext because (1) the bumping incident never happened, (2) the punishment handed out to the two people involved in the argument was very different, and (3) the prior incident involving Ms. Morrison and Mr. Flesch was similar,

11

except there the alleged victim of the physical contact was black and the perpetrator was white, and no one was fired for that incident.

The first two reasons are essentially irrelevant. If, as the record suggests, Mr. Weber and Ms. Clement both believed the incident took place as Ms. Cassill and Mr. Chambers described, the fact that it may not have does not change the nature of their belief, and that belief would certainly have justified (and did justify, according to the record) treating Ms. Martin differently than Ms. Cassill. As to the prior incident, it cannot be reasonably inferred from this record that anyone at Mars Petcare actually concluded that Mr. Flesch pushed Ms. Morrison. Apparently, there were no witnesses to that incident besides the two participants, so there was no way to resolve the discrepancy in their version of events. The record appears undisputed that the discipline handed down in that incident was based on Mars Petcare's inability to decide whether a touching had occurred or not. Nothing suggests that Mars Petcare honestly believed Mr. Flesch initiated physical contact with Ms. Morrison but still decided not to fire him. Had the two incidents been similar, and had Mars Petcare treated Ms. Martin differently from some other white employee who had bumped another employee during an argument, there might well be some basis for disbelieving Mars Petcare's explanation about why it fired Ms. Martin. However, there is nothing in this record which would allow a jury to find that this is what happened. Therefore, Ms. Martin has not successfully rebutted the evidence that she was fired because the people who made that decision thought - rightly or wrongly - that she bumped Ms. Cassill, nor has she shown that they did not take any reasonable steps to find out the truth. The issue here is not, ultimately, if Mars Petcare made the most thorough investigation of what happened, or reached the right conclusion,

but whether it fired Ms. Martin either in whole or in part because of her race.  A jury simply could not reach that conclusion from the evidence of record.  Consequently, Mars Petcare is entitled to summary judgment.

## IV. Conclusion

Based on the foregoing reasons, the Court grants the defendant's motion for summary judgment (#28).  The Clerk is directed to enter judgment in favor of defendant Mars Petcare.


                                            /s/ Terence P. Kemp
                                            United States Magistrate Judge